CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

9/27/18

JULIA C. DUDLEY, CLERK
BY:    s/ K. DOTSON
       DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Harrisonburg Division

| | | |
|---|---|---|
| SUSAN T., | ) | |
| Plaintiff, | ) | Civil Action No. 5:17-cv-00026 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | By:   Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

Plaintiff Susan T., appearing pro se, asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c). ECF No. 6. Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, the decision will be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

1

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Susan T. filed the underlying DIB application in June 2011, alleging disability because of chronic obstructive pulmonary disease ("COPD"), boils over her entire body, migraine headaches, diverticulitis, obesity, sleep apnea, hypertension, high cholesterol, and problems with her heart, back, and thyroid. Administrative Record ("R.") 89–90, ECF No. 11. She alleged disability beginning on May 18, 2011, R. 89, which was one day after the Commissioner issued a final decision denying Susan T.'s prior applications for benefits, R. 11, 75–83, 114. Disability Determination Services ("DDS"), the state agency, denied her current claim initially in August 2011, R. 88, and on reconsideration in December of the same year, R. 100. On January 30, 2013, Susan T. appeared with counsel and testified at an administrative hearing before ALJ R. Neely Owen. *See* R. 119. On February 22, ALJ Owen issued a written decision in which he concluded that Susan T. was not disabled after May 18, 2011, because her medical conditions did not prevent her from doing her past relevant work at a turkey processing plant. *See* R. 121–36.

In June 2014, the Appeals Council granted Susan T.'s request for review under the applicable regulation's "new and material evidence" provision, 20 C.F.R. § 404.970(b) (2014), vacated ALJ Owen's unfavorable decision, and remanded the case for an ALJ to reevaluate the nature and severity of Susan T.'s sleep apnea and to correct certain deficiencies in ALJ Owen's analysis of her residual functional capacity ("RFC"). R. 144; *see* R. 133 (concluding that Susan

T. retained the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b), but was

further limited to "occasional" crawling, crouching, kneeling, stooping, and climbing ladders).

On July 23, 2015, Susan T. appeared with different counsel for a second hearing before

ALJ Owen.[1] *See* R. 32–48. A vocational expert ("VE") and a medical expert ("ME") also

testified at this hearing. R. 48–68. ALJ Owen issued a new unfavorable decision on January 7,

2016. *See* R. 10–23. He first found that Susan T. had not worked since May 18, 2011, and that

she met the Act's insured-status requirements through March 31, 2014.[2] R. 13. At step two, he

found that "through the date last insured, [Susan T.] had the following severe impairments:

hypertension, hypolipidemia, coronary artery disease controlled with stents, headaches,

obstructive sleep apnea, discogenic/degenerative back disorder, and obesity." *Id.* All of her other

conditions were deemed non-severe medical impairments, R. 13–14, and none of her severe

impairments met or medically equaled any of the relevant Listings, R. 14–15.

ALJ Owen then evaluated Susan T.'s RFC during the period at issue and found that she

could have performed "the full range of light work" without additional restrictions.[3] R. 15. This

---

[1] The administrative record filed with this Court does not contain a transcript of Susan T.'s testimony given at the first hearing in January 2013. Additionally, although ALJ Owen told Susan T. and her attorney that they did not need "to rehash" everything from the first hearing because he intended "to accept into the record the testimony she [previously] provided," R. 40, his summary of Susan T.'s testimony in the operative written decision appears to incorporate only those statements she made at the second hearing in July 2015. R. 16; *see* R. 133.

[2] To qualify for DIB, Susan T. "must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 656; *see* 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131 (2015). In making this determination, ALJ Owen was required to consider Susan T.'s "complete medical history," 20 C.F.R. § 404.1512(d)(2), including any relevant evidence created after her date last insured ("DLI") that suggested some link between her "post-DLI state of health and her pre-DLI condition," *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). ALJ Owen's decision includes a fairly complete and accurate summary of the relevant post-DLI evidence. R. 19–20.

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these modest lifting requirements can perform light work only if he or she can also "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990). Light work typically requires a total of six hours of standing and walking during an

RFC ruled out Susan T.'s return to her past relevant work as a certified nursing assistant. R. 22.

Finally, based on this RFC finding and the VE's testimony, ALJ Owen concluded that Susan T.

was not disabled between May 18, 2011, and March 31, 2014, because she could have performed

certain widely available light occupations, such as companion, mail clerk, or cashier. R. 22–23.

The Appeals Council denied Susan T.'s request for review, thereby making ALJ Owen's January

7, 2016 written decision "the final decision of the Commissioner" denying Susan T.'s DIB

application. R. 1–2. This appeal followed.

### III. Discussion

Susan T. filed a brief explaining her position why the Commissioner's final decision is

not supported by substantial evidence or why the decision otherwise should be reversed or the

case remanded. *See* Pl.'s Br. 1–12, ECF No. 18; W.D. Va. Gen. R. 4(c). First, she argues ALJ

Owen erroneously found that her hidradenitis suppurativa and seborrheic keratosis were non-

severe medical impairments. She contends that these skin disorders did not respond to treatment

and made it "very painful" for her to walk, sit, and wear clothes. *See* Pl's Br. 3–4, 7–8. Second,

Susan T. argues that substantial evidence does not support ALJ Owen's RFC determination

because he improperly weighed conflicting subjective evidence bearing on the severity and

functionally limiting effects of her chronic headaches and lower back pain. *Id.* at 5, 9–12. Her

first argument is meritless, but her second argument is persuasive and warrants reversal and

remand for the Commissioner to adequately explain her decision.

*A.    Non-Severe Medical Impairment*

At step two, the ALJ determines whether the claimant has a "severe" medically

determinable physical or mental impairment or combination of impairments. 20 C.F.R. §

---

eight-hour workday. SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see Neal v. Astrue*, Civ. No.
JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010).

404.1520(a)(4)(ii). An impairment or combination of impairments "is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996). Conversely, a medical impairment or combination of impairments "can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual," *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that it does not meaningfully disrupt his or her ability to perform basic work activities, SSR 96-3p, 1996 WL 374181, at *2. *See Felton-Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir. 2011) (per curiam) (explaining that although step two involves "a threshold question with a de minimis severity requirement," "medical conditions alone do not entitle a claimant to disability benefits; '[t]here must be a showing of related functional loss'" (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986))). "Basic work activities" are the fundamental "abilities and aptitudes necessary to do most jobs," such as sitting, standing, and walking, or responding appropriately to other people, following simple instructions, and dealing with normal workplace situations. 20 C.F.R. § 404.1521(b) (2015).

Susan T. challenges ALJ Owen's evaluation of her hidradenitis suppurativa and seborrheic keratosis, which "is a rare, long-term skin condition that [causes] small, painful lumps under the skin." Pl.'s Br. 3. At the administrative hearing in July 2015, Susan T. testified that she constantly had "very painful" boils "everywhere on [her] body," and that each lesion lasted until it either "bust[ed] open on its own" or had to be lanced by a doctor. R. 47–48. She was not undergoing any treatment at this time because her dermatologist said "there was nothing more she could do." R. 48.

ALJ Owen concluded that Susan T.'s hidradenitis suppurativa and seborrheic keratosis were non-severe medical impairments because the resulting "skin lesions ha[d] been responsive

to treatment" in July 2011, August 2012, and June 2014, and had "not resulted in any work related limitations in functioning." R.13 (citing R. 686, 695, 1159–74, 1273–76). Susan T. counters that her skin disorder did not respond to several different treatments, Pl.'s Br. 7–8 (citing R. 695, 825, 1159, 1162, 1165, 1273, 1275), and that the lesions made it "very painful to walk, to wear clothes, and [to] sit," *id.* at 4. She has a valid point about this impairment's purported response to treatment. Indeed, several clinic notes show that the "recalcitrant" moderate-to-severe skin disorder did not respond to increasingly aggressive (albeit sporadic and often incomplete) treatment with antibiotics and minimally-invasive surgical procedures. *See* R. 1159, 1162, 1273–74. This evidence contradicts one of ALJ Owen's reasons for finding this medical impairment non-severe.

Even so, ALJ Owen's step-two conclusion is otherwise fully supported by the record that was before the agency, which contains "no allegation" or other information suggesting that Susan T.'s chronic skin disorder caused more than minimal "physical or mental limitation or restriction of a specific functional capacity" needed to perform basic work activities. *Cf.* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the [ALJ] must consider the individual to have no limitation or restriction with respect to that functional capacity."). For example, although Susan T. testified that she constantly had "very painful" boils "everywhere on [her] body," R. 47–48; *see* R. 16, she did not say whether or how these lesions impacted her functional capacities. *See Felton-Miller*, 459 F. App'x at 229–30 ("[M]edical conditions alone do not entitle a claimant to disability benefits; '[t]here must be a showing of related functional loss.'" (quoting *Gross*, 785

F.2d at 1166)). Susan T.'s testimony that the lesions were "very painful," without more, does not establish that she suffered from any particular work-related limitations.

Susan T.'s treatment records and agency-level paperwork also did not suggest that she had any specific, ongoing functional limitations related to her skin disorders. *See generally* R. 345–46, 348–55, 375–76, 380–87, 686, 695, 1165, 1173–74, 1272–76. Indeed, despite Susan T.'s reports that she suffered from recurrent skin lesions for more than a decade, R. 695, 1165, the entire medical record documents only one complaint that the lesions caused enough discomfort to interfere with her daily life, R. 1273–75 (June 6, 2014). But, that was almost three months after her DLI, and she merely mentioned that wearing clothes and shaving tended to aggravate an otherwise "mild" case of "irritated" lesions for which she had not sought any treatment in at least eighteen months. R. 1273–75. As the person seeking benefits, Susan T. was primarily responsible for producing evidence sufficient to persuade the administrative fact-finder that her skin disorders had more than a minimal effect on her physical or mental capacities to perform basic work activities before her insured status expired on March 31, 2014. *See Coffey v. Colvin*, No. 1:09cv830, 2013 WL 6410383, at *4 (M.D.N.C. Dec. 9, 2013); 20 C.F.R. § 404.1512. I cannot fault ALJ Owen for concluding that Susan T. failed to carry her burden.

*B.       RFC Determination*

Susan T.'s other objections generally impugn the ALJ's RFC determination. *See* Pl.'s Br. 5, 9–12. A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite her medical impairments." SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R. § 404.1545. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller*, 459 F. App'x at 230–31, and it must reflect the

combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible reports of pain or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015).

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *id.*, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, and articulate specific reasons for the weight assigned to those statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013). When conducting this evaluation, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms caused by a medical impairment; he cannot reject the claimant's description of her symptoms "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c); *see Hines*, 453 F.3d at 565. The ALJ's reasons for discounting a claimant's complaints need only be legally adequate and supported by substantial evidence in the record. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

More generally, the ALJ's RFC assessment must "include a narrative discussion describing" how medical facts and nonmedical evidence "support[] each conclusion," *Mascio*,

780 F.3d at 636, and explaining why the ALJ discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supported the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017). This discussion should "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37. "In other words, the ALJ must both identify evidence that supports his conclusion and build an accurate and logical bridge from that evidence to his conclusion" that the claimant is not disabled. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (alterations omitted).

### 1.    Summary of the Relevant Evidence

Susan T. claims that she was disabled during the relevant time primarily because her obstructive sleep apnea, recurrent headaches, lumbosacral discogenic/degenerative disc disease, and morbid obesity caused constant pain and other symptoms that severely restricted her capacities to sit, stand, walk, go to work on a regular basis, and stay on task throughout an eight-hour workday. *See generally* R. 42–44, 50, 64–66, 375–76, 380–87, 1176–81, 1434–35; Pl.'s Br. 5, 9–12. ALJ Owen found that these medical impairments could reasonably be expected to cause Susan T.'s symptoms, but that the "totality of the evidence fail[ed] to substantiate that her limitations were of the degree and intensity alleged and that they were of a nature to preclude her from performing basic work activities at the light exertional level" before her DLI. R. 20. Susan T.'s objections focus on ALJ Owen's decisions to fully credit a non-examining physician's identical RFC assessment and to reject all of Susan T.'s statements and her treating physicians' opinions describing more significant pain-related functional limitations. *See* R. 20–21.

Susan T. has reported suffering intense recurring headaches for many years. *See, e.g.*, R. 465, 961, 1099, 1398. In December 2010, Susan T. told neurologist Glenn Deputy, M.D., that she was "symptomatic with migraine 25 or 26 days of the month, with only four or five headache-free days a month." R. 465. She had "failed all types of prophylactic medications," *id.*, and "tried virtually everything else" to control her symptoms, which included nausea, sensitivity to light and sound, and incapacitating pain, R. 465–66. She took oxycodone for the pain, but still frequently went to the hospital for emergency treatment. R. 465; *see also* R. 499 (July 2011 progress note from former primary-care provider noting Susan T.'s reports that Percocet was "helpful" for her migraine pain, which she experienced once a week for the past three months, and that she "sometimes [took] a max of 10 pills" in a day). Her neurological examination was normal on this visit. R. 466. Dr. Deputy recommended that Susan T. try Botox injections in hopes that it would reduce her need for "chronic narcotic pain relief and visits to the emergency room for rescue injections." *Id.*

On September 12, 2012, Susan T. saw Rufus Huffman, M.D., her long-time primary-care physician at Bridgewater Family Medicine, *see* R. 1176, for "a number of complaints" related to her chronic conditions, R. 889. Her most pressing concern was "persistent frequent severe headaches, which she believe[d were] migraines." R. 889. She never tried the Botox injections because she could not afford to pay for them out of pocket. *Id.* ("She reports that [Dr. Deputy] indicated that he would need to give 6 injections and they would be $500 a piece and would not be covered by insurance companies and she could not afford this."). Dr. Huffman referred Susan T. to a pain management clinic and gave her enough oxycodone to last until she could get an appointment there. *See* R. 889–91, 909. Aside from noting that Susan T. was "obese" at 257

pounds, Dr. Huffman did not document any relevant findings on this date's neurophyiscal examination. *See* R. 889–93.

Susan T. visited the pain clinic at the University of Virginia ("UVA") on November 6, 2012. R. 961–64. She described having "daily headaches for over 15 years" that felt like "someone is hitting [her] in the head." R. 961. Nothing helped the pain except oxycodone, which provided relief for about four hours after the onset of each headache. *Id.* Her neurophysical examination was normal on this visit. R. 963. Berkeley Martin, M.D., opined that Susan T. "likely ha[d] sleep apnea given [her] body habitus and history of snoring, which [was] probably contributing to her headaches," and he encouraged her to go forward with a sleep study that Dr. Huffman had previously recommended. *Id.* Dr. Martin also encouraged Susan T. to stop smoking, lose weight, and "wean off the oxycodone as it is not a good headache medication" and likely was causing "rebound headaches." R. 963–64.

On April 17, 2013, Susan T. told a neurologist that "for the past few months she ha[d] been prescribed OxyContin" to relieve her headaches and that she took two pills a day, but that she still experienced debilitating headaches with nausea, vomiting, and photosensitivity at least five days per week. R. 1398. Relevant findings on a comprehensive neurophysical examination showed that she was 5'2" tall and weighed 274 pounds, had "normal base and stride," and exhibited full (5/5) muscle strength in all four extremities. R. 1402–03. The neurologist explained that her headache pain likely was exacerbated by "overuse of narcotic medication." R. 1395. He prescribed a migraine preventative agent and counseled her to drink more water and less caffeine. *Id.* On September 26, one of Dr. Huffman's colleagues "made it clear" to Susan T. that narcotics like oxycodone "are not indicated for the treatment of migraine pain" and instructed her to taper off that medication. *See* R. 1331–34. On October 8, Dr. Huffman gave

Susan T. enough Percocet (oxycodone) to last until she could establish care with a neurologist, but also encouraged her to taper off the narcotic and "to lose some weight." R. 1326. Dr. Huffman did not document any relevant findings on that date's neurophysical examination, except to note that Susan T. weighed 282 pounds. R. 1324–26. In July 2014, a neurologist at UVA noted that Susan T. was "no longer prescribed" oxycodone because she had "abused" that drug in the past. R. 1423; *see, e.g.*, R. 844, 846, 850, 861, 873, 881, 883, 887.

Susan T. underwent a sleep study in April 2013. *See* R. 1182–83, 1187–97. Frank Barch, M.D., diagnosed "severe" obstructive sleep apnea and expressed concern that they "urgent[ly]" needed to "achieve prompt control," R. 1182, of her "significant" arterial oxygen desaturation levels, R. 1188. He explained that Susan T. would need to use a CPAP machine at night and cautioned that the next few weeks would be "challenging" while they figured out "what kind of full face mask" she should wear. R. 1182. Dr. Barch also "emphasized the importance of full compliance with PAP therapy" given the severity of her sleep apnea. R. 1183. Susan T. agreed and was given a CPAP machine to use at home. *See id.* During a fifteen-night trial in mid-May 2013, she used the machine for only a few hours at a time on five nights, and she did not use the machine at all on ten nights. R. 1202–03 (showing usage on May 8–9, 12, and 14–15). On May 24, Dr. Barch wrote a prescription for a CPAP nasal mask and instructed Susan T. to continue the at-home trial. R. 1201. There are no medical records indicating that Susan T. ever filled this prescription or attended a follow-up appointment scheduled for June 21. *See* R. 1182–83, 1188, 1201. October 8, 2013, Susan T. told Dr. Huffman that she still had not found a CPAP mask that worked for her. R. 1324.

In July 2014, Susan T. told neurologist Kenneth Leone, M.D., that the CPAP machine "had to be returned due to non-adherence" and that she had not undergone any further treatment.

R. 1423. Dr. Leone noted that Susan T.'s chronic migraines were "likely fueled by" obesity and untreated obstructive sleep apnea, versus a "more worrisome[] secondary cause" given that her neurological examination was "benign." R. 1429. Other relevant findings on physical examination were "normal," at least for Susan T.'s extremely obese body habitus. *See* R. 1427 (recording a BMI of 50); SSR 02-01p, 2002 WL 34686281, at *2 (Sept. 12, 2002) (instructing that "BMI 40 or greater" is considered "extreme obesity"). Dr. Leone prescribed a daily headache prophylactic, administered Botox injections, and instructed Susan T. to return in three months for additional injections. *See* R. 1417–29. He also cautioned that they "may not get anywhere in terms of treating her headaches" if her obesity and obstructive sleep apnea were "not adequately addressed." R. 1429. Susan T. later reported that two rounds of Botox injections did not help and that she could not function with her recurrent migraines. R. 1418–21.

Susan T. also described her headaches in a Pain Questionnaire and Adult Function Report submitted in November 2011. At that time, she was having several spontaneous headaches a week, each of which lasted for one or two days, R. 375, and left her unable to consistently tend to her personal-care needs, R. 370. Everything made the pain worse, but oxycodone, migraine shots, and "doing nothing" tended to help. R. 375–76. At the administrative hearing in July 2015, Susan T. testified that she stayed in contact with Dr. Barch's clinic after her initial sleep study in April 2013 and "went through a couple of different masks" while trying the CPAP machine, but she "couldn't get in compliance with the mask that [she] was provided" before her insurance coverage ran out. R. 66–67. Now she "had to start all over with another sleep study test." R. 67–68. Susan T. continued to smoke, R. 49, and weighed 274 pounds, which "put her at a high BMI" given her height of 62 inches, R. 50. She had stopped taking Percocet for migraines in April 2012, R. 46–47, but still "regularly" suffered from intense unpredictable headaches, R. 65.

*b.*      *Lumbosacral Disorders & Back Pain*

On March 14, 2012, Susan T. visited her former primary-care provider, Arlene McCain, M.D., complaining of increasingly severe "constant" lower back pain without radiation. R. 800–01. Her physical examination was mostly unremarkable, including negative straight-leg raising tests and normal muscle strength, except that she had "restricted" range of motion "at the hip due to decreased flexibility," "tenderness across the lumbar spine," and increased lower back pain with internal rotation of the hip bilaterally. R. 802. Dr. McCain ordered lumbar X-rays, R. 799, which showed degenerative disc disease at "L3-L4, L5-S1, and spurs at L4, L5," R 846. On April 26, Susan T. reported back pain "any time she does anything or sits for long periods of time." R. 846. Findings on physical examination were the same as at the prior month's visit. R. 847. Dr. McCain prescribed a steroid taper followed by a daily pain medication and referred Susan T. to an orthopedist. *Id.*

Susan T. established care with Thomas Weber, M.D., at RMH Orthopedics & Sports Medicine on June 19, 2012, to manage her back pain. R. 990–95; *see* R. R. 1324. She reported persistent aching pain in her lower back aggravated by sitting, standing, walking, twisting, bending, and doing daily activities. R. 990. On physical examination, Susan T. had full strength in her lower extremities and could "easily" stand on her heels and toes, but walked with a "compensated" gait, had "mild restriction" on flexion, extension, and lateral bending, and endorsed pain and tenderness over the sacroiliac joint, sciatic notch, sacrum, and greater trochanter. R. 992. Dr. Weber thought that "weight loss, physical therapy, and a back brace would be a good place to start" given her "large abdominal pannus," and noted that Susan T. may also need to take anti-inflammatory medication for pain. *Id.* On July 17, Susan T. told Dr. Weber that twice weekly physical therapy "help[ed] somewhat," but she still had persistent lower

back pain aggravated by most physical activities. R. 1000–01. Findings on physical examination were essentially the same as at the prior month's visit, except that Susan T. now had "moderate restriction" on extension of the lumbar spine. R. 1001. Dr. Weber noted that Susan T. may need an MRI and injections if physical therapy did not provide adequate relief. *Id.*

Susan T. attended physical therapy between late June and early August 2012, *see* R. 1021–49, but was eventually discharged for missing too many appointments, R 1050. On initial evaluation, Susan T. exhibited slightly decreased (4/5 to 4+/5) muscle strength in her lower extremities, "fair" body mechanics, and restricted (25% to 50%) ranges of motion of the lumbosacral spine. R. 1021. Progress notes show that Susan T. reported "significant" pain relief and/or "increased ease with functional mobility" after many therapy sessions, *see, e.g.*, R. 1029–30, 1034, 1039, but sometimes did not follow homecare measures specifically tailored to her reported symptoms and limitations, such as using a lumbar roll when sitting, R. 1033, 1035, 1045. By July 31, Susan T. had improved muscle strength (4+/5 to 5/5) in both lower extremities and range of motion in her lumbar spine, including 100% flexion and extension. R. 1039. She rated her pain as a two on a ten-point scale. *Id.*

On August 28, 2012, Susan T. told Dr. Weber that she was experiencing persistent "severe" lower back pain that had not responded to physical therapy. R. 1008–09. Findings on physical examination were the same as at the prior month's visit, including that she walked with a "compensated" gait and had "moderate" restriction on extension of the lumbar spine. R. 1009. A lumbar MRI taken the same date showed multilevel discogenic bulging and "mild" to "moderate" degenerative changes. R. 951. On September 11, Dr. Weber opined that this MRI also showed "a significant left-sided herniation at the L5-S1 level and annular tears at the L4-5 level." R. 1018. Findings on physical examination were the same as at the July and August visits.

*Id.* Dr. Weber and Susan T. "agreed that epidural injections would be reasonable" treatment to supplement her narcotic pain medication. *Id.* Susan T. had one epidural steroid injection in September 2012, but she reportedly did not realize much relief. *See* R. 954, 1387, 1391.

On May 30, 2013, Susan T. returned to Dr. Weber's clinic complaining of fairly mild persistent lower back pain aggravated by "any movement." R. 1387 ("Severity level is 3."). Findings on physical examination were unchanged from her last appointment eight months earlier. *Id.* Dr. Weber recommended that Susan T. try facet injections given that her MRI showed "moderate facet arthritis." *Id.* It appears that these injections were not immediately scheduled, and that they ultimately were delayed for more than a year while Susan T. received treatment for her cardiac condition. *See* R. 1374. Susan T. next saw Dr. Weber on April 28, 2014, about one month after her DLI. R. 1373–74. She was taking Tramadol for pain and rated her persistent lower back ache as mild, but worsening, and aggravated by changing positions, lifting, sitting, standing, and walking. R. 1373 ("Severity level is 2."). Susan T. had facet injections in May and June, R. 1383, followed by lumbar medial branch blocks in July, R. 1377, and a lumbosacral "medial branch denervation" procedure in August 2014, R. 1375. Contemporaneous surgical notes indicate Susan T. was "a candidate" for this increasingly aggressive treatment, including the lumbar denervation, because she reported "greater than 50% pain relief" after the medial branch block injections. R. 1377; *see* R. 57–58 (medical expert testifying that denervation is "not a treatment that a lot of people do" because the nerve is "never going to come back" once you "kill it").

On June 1, 2015, Susan T. followed up with Christopher Hess, M.D., at RMH Orthopedics & Sports Medicine. R. 1437–49. She reported persistent "moderate-severe" lower back pain radiating into the right buttock that was aggravated by sitting and made it difficult for

her to walk. R. 1437, 1440. Susan T.'s pain "ha[d] not remitted since denervation was performed" in August 2014, R. 1441, because she now had "more pain" in a different area, R. 1437. Her physical examination on this date was mostly unremarkable, including normal gait and painless range of motion in the SI joints, except that she had positive facet loading on the left and "mild restriction" with flexion, extension, and lateral bending of the lumbar spine. R. 1441. Dr. Hess ordered another round of lumbar medial branch blocks and referred Susan T. to pain management. R. 1437, 1441.

In the November 2011 Pain Questionnaire and Adult Function Report, Susan T. stated that her constant back pain was aggravated by sitting, standing, and moving, and relieved by oxycodone and rest. R. 375–76. She could walk for about twenty minutes before needing to rest, R. 385, and she essentially spent her days lying on the couch watching television, R. 380–84. At the administrative hearing in July 2015, Susan T. testified that the epidural steroid injections, medial branch blocks, and lumbar denervation procedure provided only "temporar[y] relief" for her chronic lower back pain, R. 45, and that this pain was the primary cause of her physical limitations, R. 42–44. She could walk for three or four blocks, stand for forty five minutes at one time, sit in the same position for about thirty minutes, and stay on task for "maybe two [or] three hours" if she could switch at will between sitting and standing. R. 42–44. After two or three hours, she would need to lie down and rest her back for some period of time. R. 44.

c.    *Medical Opinions*

In December 2011, William Amos, M.D., reviewed Susan T.'s medical records submitted to DDS through that date as part of a reconsideration-level review of her DIB application. *See* R. 101–12. Dr. Amos opined that Susan T. could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; sit and stand/walk for about six hours each in an eight-

hour workday; push and/or pull without limitation, up to the weights and frequencies shown for lift and/or carry; frequently climb ramps/stairs and balance; and occasionally stoop, kneel, crouch, crawl, or climb ladders/ropes/scaffolds. R. 110. He explained that, although Susan T. complained of pain, the available medical records showed that she could "stand, walk, and move about within normal limits" and had "no signs of severe muscle weakness." R. 112.

Dr. Huffman completed a Physical RFC Questionnaire on January 29, 2013. R. 1176–81. He diagnosed Susan T. with morbid obesity, "bulging disc disease," chronic lower back pain, and "uncontrolled" daily migraine headaches that required Percocet because other migraine medications had "not been effective or tolerated." R. 1176. Susan T.'s migraines and back pain were severe enough to "constantly" interfere with the attention and concentration needed to perform even simple work tasks, R. 1178, and likely would cause her to miss more than four days of work each month, R. 1180. Dr. Huffman opined that Susan T. could never twist, stoop (bend), crouch/squat, climb stairs, or lift/carry anything weighing "less than 10 lbs.," R. 1179–80; could walk one city block without rest or severe pain, R. 1178; could sit and stand for twenty minutes each before needing to change position; sit and stand/walk for less than two hours total during an eight-hour workday; needed a job where she could shift positions at will from sitting, standing, or walking because she had to walk around for fifteen minutes several times each hour; and needed to take an unscheduled fifteen-minute break every hour throughout the workday, R. 1179. He noted that Susan T. had been his patient for more than a decade by this point, R. 1176, and that it was his opinion that her diagnosed medical conditions were "reasonably consistent with the symptoms and functional limitations described in [his] evaluation," R. 1178.

Dr. Hess completed a similar Physical RFC Questionnaire on June 11, 2015. R. 1434–35. He had examined Susan T. at least twice, the first time being on May 15, 2014, R. 1434, when he

oversaw her first round of lumbar facet injections, *see* R 1383. Dr. Hess opined that Susan T. could walk three or four blocks at one time, stand for forty-five minutes at one time, sit for thirty minutes at one time, and persist in a task for up to three hours at one time if she had the option to alternate between sitting and standing. *See id.* He "absolutely" thought that Susan T. had been "unable to do substantial[] gainful activity by reason of medical determinable impairments or the cumulative effect of a combination of physical impairments which [were] expected to last a continuous period of not less than one year from May 2011." R. 1435. Dr. Hess explained that these opinions were based on his own "complete physical examination" of Susan T., as well as his review of her medical "history" and the September 2012 lumbar MRI. *Id.*

William Erwin, M.D., the impartial medical expert who testified at the July 2015 hearing, opined that Susan T.'s diagnosed medical conditions included uncontrolled obstructive sleep apnea; lumbosacral degenerative joint disease at L3-L4, L4-L5, and L5-S1; tobacco abuse disorder; obesity; and headaches that had "been described as migraines, but of which there [were] other descriptions also." R. 48–50. Dr. Erwin explained that Susan T.'s history of "frequent" migraine-type headaches was "a little unusual in that as a rule migraines do not occur every day or nearly every day." R. 50 (spelling corrected). Susan T.'s "very low" nocturnal oxygen saturation levels, however, would have been "enough to give her a headache . . . and to make her feel fatigued" on a regular basis. R. 53 (citing R. 1188).

Dr. Erwin testified that Susan T. had "been frequently noncompliant" with prescribed or recommended treatment, which likely (but not definitively) explained why she still suffered headaches, fatigue, and difficulty breathing. *See* R. 51–53, 56–57. He was particularly skeptical of Susan T.'s explanation that she could not find the right CPAP mask after being diagnosed with severe obstructive sleep apnea. R. 51. He explained there were many options for masks, but

that none were "terribly comfortable" and it usually took two or three weeks for the patient to adjust to CPAP therapy. R. 52 ("Sometimes people are not willing to take that long."). Dr. Erwin thought that Susan T.'s "sleep apnea could be controlled" if she "work[ed] with the sleep center" to find the right settings and equipment. *Id.* Getting Susan T.'s obstructive sleep apnea under control could be "significant" in terms of her ability to work and "probably" would have allowed her to perform a full range of light work. R. 54; *see also* R. 53 (clarifying that treating Susan T.'s sleep apnea would not have addressed her morbid obesity, which also contributed to her back pain and recurrent headaches). Dr. Erwin noted that he based this opinion "on objective data in the record," but he did not explain how he concluded based on this medical evidence that Susan T. could actually perform the specific physical demands of light work. R. 54.

Dr. Erwin was also skeptical of the significant limitations on sitting, standing, and walking that Susan T. had attributed to her lumbosacral degenerative joint disease and attendant lower back pain. *See* R. 42–44, 49, 58–59. He explained that while this impairment "could" produce the specific limitations alleged, Susan T.'s medical record contained "no objective data to support those subjective complaints." R. 58. Given the degree of limitation alleged, Dr. Erwin explained that one "would expect" the patient's physical examinations to show "significant pain" and "significant[ly]" reduced range of motion in the joints involved. R. 60. One "would not expect a normal exam" of the lumbar spine, *id.*, such as those supposedly documented by Dr. Weber in June 2012 and Dr. Huffman in October 2013, R. 59–60 (citing R. 992, 1326). Dr. Erwin later submitted a Medical Clarification Questionnaire after reviewing Dr. Hess's RFC assessment, which he had not had an opportunity to do before the July 2015 hearing. R. 1461–63. He noted that Dr. Hess's assessment did not "alter the opinion" he provided at the hearing, R. 1461, because Dr. Hess's findings on the June 2015 physical examination did "not support" the

limitations he identified in his subsequent RFC assessment, R. 1463. Dr. Erwin also reiterated that Susan T. could "do light levels of work," but he did not provide any support or explanation for that conclusion. *Id.* He did not offer an opinion on Susan T.'s ability to persist through an eight-hour workday, five days a week.

2.      *The ALJ's Decision*

ALJ Owen considered Susan T.'s medical impairments and pain-related limitations throughout his written decision. *See* R. 13–21. At step two, he found that her headaches, obstructive sleep apnea, discogenic/degenerative back disorder, and obesity were severe medical impairments through March 31, 2014, because they caused "more than mild limitations in [her] ability to perform basic work activities," R. 13, which, according to the regulations, include physical functions like sitting, standing, and walking and mental functions like exercising judgment and responding appropriately to usual work situations. 20 C.F.R. § 404.1521(b)(1). ALJ Owen then summarized much of the evidence related to Susan T.'s pain and other symptoms, including progress notes, treatment recommendations, neurophysical examination findings, diagnostic tests and images, medical opinions, and Susan T.'s statements both to her healthcare providers and at the July 2015 administrative hearing. R. 16–21. After considering this evidence, ALJ Owen found that Susan T. could have performed "the full range of light work" as defined in 20 C.F.R. § 404.1567(b), which meant that she retained the physical capacities to lift up to twenty pounds at a time, frequently lift or carry objects weighing ten pounds, and otherwise do work that either "require[d] a good deal of walking or standing" or "involve[d] sitting most of the time with some pushing and pulling of arm or leg controls." R. 15; *see also Neal*, 2010 WL 1759582, at *2 ("The full range of light work requires the ability to

stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" (quoting 20 C.F.R. § 404.1567(b)).

In crafting this RFC, ALJ Owen gave three overarching reasons why Susan T.'s testimony describing essentially disabling pain and functional limitations, *see* R. 16, was "not entirely credible" when compared to her "generally unremarkable" treatment record, R. 20 (citing R. 440–697, 705–85, 820–1174, 1182–1203, 1239–1429, 1437–54). First, "[n]one of the imagery or testing evidence provide[d] objective support for an impairment that could reasonably produce the extent or intensity of [her] expression of subjective pain/symptoms" because Susan T. had "been noted to have only mild to moderate degenerative changes on diagnostic [imaging] of her lumbar spine" and there was "no evidence of . . . a brain abnormality on diagnostic testing." R. 20. Second, objective findings on examination had been "unremarkable" overall and "repeated physical examinations ha[d] failed to reveal ongoing psychological signs or any neurological or musculoskeletal deficits" as would be expected given the "significant functional limitations" she alleged. *Id.* On the contrary, it was "noted on repeated examinations" that Susan T. had both "normal gait and station" and "normal muscle strength in her extremities." *Id.* Third, her treatment had "been generally routine, conservative, and unremarkable" because "no surgery ha[d] been recommended for her degenerative disc disease and there [was] no evidence of any treatment by a pain management specialist." *Id.* Her medical conditions had been "treated conservatively . . . with just medications prescribed by her physicians, Botox injections, and steroid injections." *Id.* ALJ Owen also found that Susan T. had been "non-compliant with treatment recommendations to quit smoking and use a CPAP machine" even though she was "advised on numerous occasions that following these recommendations would lead to improvement of her symptoms, including improvement in her migraine headaches." *Id.*

As for the opinion evidence, ALJ Owen explained that Dr. Huffman's and Dr. Hess's medical opinions deserved "minimal weight" because they "appear[ed] to be based on [Susan T.'s] subjective complaints." R. 20–21. The ALJ also found that Dr. Huffman's opinion was "inconsistent with the findings on examination and diagnostic testing, particularly the lack of strength or neurological deficits in her upper and lower extremities," R. 21, whereas Dr. Hess's opinion conflicted with the physician's "own findings on examination" showing Susan T. "had a normal gait, only mild restriction in range of motion of the lumbar spine, and normal strength and sensation in her lower extremities," *id.* (citing R. 1441). ALJ Owen gave "great weight" to both Dr. Amos's and Dr. Erwin's non-examining source opinions because he found them to be "consistent with and supported by the credible evidence of record," but he did not identify the particular evidence he found "credible" or explain how that evidence factored into his analysis of these opinions. R. 20. Between the two, ALJ Owen gave "greater weight" to Dr. Erwin's opinions that Susan T. could perform light work without any postural or environmental limitations, *see* R. 16, 21, because they were "based on [Dr. Erwin's] review of the additional medical evidence received" in the almost four years since Dr. Amos gave his slightly more restrictive opinion in December 2011, R. 21 (spelling corrected).

   *3.    Analysis*

   "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (internal citation omitted). The ALJ does not need to discuss every piece of relevant evidence, but he "must evaluate the record fairly," *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide

enough "analysis of the evidence to allow the [reviewing] court to trace the path of his reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Mascio*, 780 F.3d at 636–38; *Hines*, 453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). Similarly, it is not enough for the ALJ to summarize the relevant evidence if he then fails to adequately explain how he resolved material ambiguities or conflicts in the record and why the credited evidence supports his findings and conclusions. *See Woods*, 888 F.3d at 695; *Monore*, 826 F.3d at 191. ALJ Owen's written decision does not meet these minimum standards.

First, too "[m]uch of the ALJ's RFC assessment was devoted to summary and not enough to analysis." *Lacek v. Colvin*, Civ. Action No. CBD-13-2046, 2014 WL 2865992, at *8 (D. Md. June 23, 2014) (reversing and remanding on these grounds); *see also Boston v. Barnhart*, 332 F. Supp. 2d 879, 888 (D. Md. 2004) (reversing and remanding where the ALJ set out "a detailed summary of the medical evidence, but fail[ed] to engage in any discussion as to how this evidence support[ed] [the] RFC determination"). As noted, Susan T. claims that she was disabled during the relevant time primarily because her obstructive sleep apnea, recurrent headaches, lumbosacral discogenic/degenerative disc disease, and morbid obesity caused constant pain and other symptoms that severely restricted her capacities to sit, stand, walk, go to work on a regular basis, and stay on task throughout an eight-hour workday. ALJ Owen agreed that Susan T. had "some" exertional limitations before her DLI, R. 20, and he "summarized evidence that he found credible, useful, and consistent" with the conclusion that she could perform the full range of light work, *Woods*, 888 F.3d at 694. *See* R. 20–21. But, ALJ Owen did not adequately explain *how* he concluded—*based on this evidence*—that Susan T. could actually meet these physical demands. *Woods*, 888 F.3d at 694. Additionally, although ALJ Owen concluded that Susan T. could have

performed certain physical functions, R. 15, "he said nothing about [her] ability to perform them for a full workday," *Mascio*, 780 F.3d at 637.

Second, the ALJ's summary of the medical record omitted or minimized evidence that supported Susan T.'s and her physicians' fairly consistent descriptions of her symptoms and functional limitations, which raises concerns about whether ALJ Owen actually considered that evidence when evaluating her RFC. *Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). For example, Dr. Weber opined that the August 2012 lumbar MRI showed "a significant left-sided herniation at the L5-S1 level and annular tears at the L4-5 level," R. 1018, and he repeatedly observed that Susan T. walked with a "compensated" gait, exhibited "moderate" restriction on extension of her lumbar spine, and endorsed pain in her SI joints on physical examinations both before and very shortly after her DLI. *See* R. 992, 1001, 1009, 1018 (June–Sept. 2012); R. 1387–89 (May 2013); R. 1373–74 (Apr. 2014). In his summary, ALJ Owen mentioned only that the May 2013 note documented "painful SI joints and moderate restriction on extension on the right, but no other abnormalities" and that the April 2014 note documented "restricted lumbar extension, a compensated gait, [and] . . . painful [SI] joints." R. 18–19 (citing R. 1389, 1374). ALJ Owen also mentioned that the August 2012 lumbar MRI showed "discogenic protrusions at L3-S1 with mild to moderate foraminal stenosis," R. 17 (citing R. 951), but he did not acknowledge Dr. Weber's opinion that the same MRI showed additional and even more significant abnormalities. Nor did ALJ Owen mention any of Susan T.'s physical therapy notes from summer of 2012, most of which documented some degree of

restricted range of motion in the lumbosacral spine and decreased muscle strength in both lower extremities. *See* R. 1021, 1027, 1029, 1031, 1033, 1035, 1039.

Yet, ALJ Owen essentially rejected Susan T.'s statements and Dr. Huffman's medical opinion describing "significant" pain-related limitations during the same time period. He did so because he concluded those subjective statements were inconsistent with the "generally unremarkable" objective findings on diagnostic images and "repeated" physical examinations, all of which supposedly showed Susan T. had "normal gait and station" and "normal muscle strength in her extremities," documented only "mild to moderate degenerative changes" in the lumbar spine, and "failed to reveal . . . *any* neurological musculoskeletal deficits[] as would be expected with the degree of limitation alleged." R. 20 (emphasis added); *see* R. 21. ALJ Owen's failure to mention "an entire line" of objective medical evidence that directly contradicted this rationale, or to provide any explanation why he apparently thought these abnormal musculoskeletal findings were in fact unremarkable, leaves the Court unable "to tell whether the ALJ's decision rests upon substantial evidence." *Golembiewski*, 322 F.3d at 917; *see also Radford*, 734 F.3d at 296. Further, ALJ Owen did not explain how "the lack of any strength or neurological deficits in [Susan T.'s] upper and lower extremities," R. 21, would be relevant to the many *non-exertional* functional limitations Dr. Huffman attributed to her "uncontrolled migraines" and "morbid obesity," such as her inabilities to attend work on a regular basis, concentrate on simple work tasks, or perform postural activities like twisting and bending, R. 1176, 1178, 1180. *Cf. Lewis*, 858 F.3d at 869 ("The ALJ does not explain, for instance, how Lewis' normal gait bears any nexus to her complaint of chronic shoulder pain.").

Finally, ALJ Owen did not properly evaluate all of the available medical opinions. Medical opinions are statements from "acceptable medical sources," such as physicians, that

reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. § 404.1527(a)(1). The ALJ must adequately explain the weight afforded to each medical opinion in the claimant's record, taking into account relevant factors such as the nature and extent of the physician's treatment relationship with the claimant; how well the physician explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the physician's area of specialty. *Id.* § 404.1527(c). Medical opinions from treating and examining physicians typically deserve more weight than those from non-examining sources, such as a medical expert or the state agency medical reviewers. *See Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251, 268 (4th Cir. 2017); 20 C.F.R. § 404.1527(c). However, the ALJ may rely on a non-examining source's medical opinion

> where that opinion has sufficient indicia of "supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion."

*Woods*, 888 F.3d at 695 (quoting *Brown*, 873 F.3d at 268); *see* 20 C.F.R. § 404.1527(c)(3). A reviewing court "must defer to the ALJ's assignments of weight" among differing medical opinions unless his underlying findings or rationale "are not supported by substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015); *see also Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016).

ALJ Owen gave minimal weight to Dr. Huffman's medical opinion, provided after seeing Susan T. "many times each year" for more than a decade, R. 1176, because he found that the opinion "appear[ed] to be based on the claimant's subjective complaints and [was] inconsistent with the findings on examination and diagnostic testing, particularly the lack of any strength or neurological deficits in her upper and lower extremities," R. 21. ALJ Owen did not explicitly

recognize Dr. Huffman as a treating physician, and he did not explain why the opinion appeared to be based on Susan T.'s subjective complaints rather than the physician's medical judgment that his patient's "uncontrolled migraines," "morbid obesity," and chronic low back pain secondary to bulging discs and degenerative disc disease were "reasonably consistent with the symptoms and functional limitations described in [his] evaluation." R. 1176, 1178 (emphasis omitted); *Cf. Hall v. Astrue*, No. 7:07cv590, 2008 WL 5455720, at *4 (W.D. Va. Dec. 31, 2008) (recommending reversal where the ALJ impermissibly discounted a "treating physician's opinion based on unsupported conjecture" that the physician was biased in his patient's favor), *adopted by* 2009 WL 187984 (W.D. Va. Jan. 23, 2009). Additionally, as explained, ALJ Owen did not indicate how the purported "lack of any strength or neurological deficits in [Susan T.'s] upper and lower extremities," R. 21, undercut Dr. Huffman's opinion about her non-exertional limitations, R. 1176–78, 1180–81. The overarching statement that Dr. Huffman's medical opinion was "inconsistent with" other unidentified "findings on examination and diagnostic testing" is too imprecise to explain the minimal weight accorded the treating physician's medical opinion, especially considering that ALJ Owen's selective summary of this same evidence omitted or minimized findings that tended to support the more restrictive descriptions of Susan T.'s symptoms and limitations. *See Brown*, 873 F.3d at 267–70.

ALJ Owen's decision to credit the two non-examining source opinions fails for similar reasons. First, ALJ Owen did not specify which "credible evidence of record" he was referring to when analyzing Dr. Amos's and Dr. Erwin's opinions or explain why those opinions were "consistent with and supported by" that evidence. R. 21. "As such, the analysis is incomplete and precludes meaningful review." *Monroe*, 826 F.3d at 191. Second, the fact that Dr. Erwin's opinion was "based on his review of additional medical evidence," R. 21 (spelling corrected), is

not a legitimate reason to credit his non-examining source opinion over the medical opinions from Susan T.'s treating and examining physicians. *See Brown*, 873 F.3d at 268 ("Faithless to the regulation . . . , the ALJ relied on a theory that—because [the medical expert] had simply reviewed the administrative record—he had greater knowledge of 'the longitudinal medical and mental evidence' than all of Brown's treating and examining sources."). Third, Dr. Erwin never explained how or why he concluded "based on objective [medical] data in the record" that Susan T. could have performed "light" work without any additional restrictions. *Cf. Woods*, 888 F.3d at 695 ("For example, Dr. Clayton concluded that Woods could lift up to 50 pounds (something none of her treating physicians believed she was capable of), but failed to explain *how* he arrived at that specific number."). Indeed, there is not even enough "evidence in the record to indicate what [Dr. Erwin] meant by light work, in particular if his meaning is equivalent to the definition of light work in the regulations." *Hall v. Harris*, 658 F.2d 260, 266 (4th Cir. 1981); *see, e.g.*, R. 41 ("Q: Are you familiar with the Commissioner's listings and regulations *as they relate to medical issues*? A: I am." (emphasis added)).

Finally, the two progress notes Dr. Erwin cited to explain his conclusion that the medical record contained "no objective data to support" Susan T.'s description of her chronic back pain and physical limitations do not document "totally normal" lumbar spine examinations, as Dr. Erwin initially testified. R. 58–60 (citing R. 992, 1326). Dr. Weber's June 2012 note documents his (first of many) observations that Susan T. had a "compensated" gait and restricted range of motion in the lumbar spine, R. 992, whereas Dr. Huffman's October 2013 note does not reflect any musculoskeletal findings whatsoever, R. 1326. ALJ Owen did not acknowledge this discrepancy anywhere in his written decision or explain how he resolved the material ambiguity when weighing the competing medical opinions. *See* R. 16–21.

The ALJ's selective summary of the record, combined with his failure to "both identify the evidence that support[ed]" his RFC assessment "and build an accurate and logical bridge from that evidence to his conclusion," leaves the Court unable to meaningfully review the Commissioner's final decision that Susan T. was not disabled before her DLI. *Woods*, 888 F.3d at 694 (alterations omitted). On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved, and provide a logical link between the evidence she found credible and the RFC determination.

## IV. Conclusion

For the foregoing reasons, the Court will **DENY** the Commissioner's motion for summary judgment, ECF No. 21, **REVERSE** the Commissioner's final decision, **REMAND** the decision for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: September 27, 2018

Joel C. Hoppe
United States Magistrate Judge